## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WANDA STRAUSER,    :
         :  Case No. 4:03-CV-2017
   Plaintiff   :
         :
  v.      :  (Judge McClure)
         :
JAY FULKROAD    :
AND SONS, INC.,    :
         :
   Defendant  :

## MEMORANDUM

July 28, 2005

**BACKGROUND:**

On November 10, 2003, plaintiff Wanda Strauser, filed a complaint against her former employer, defendant Jay Fulkroad and Sons, Inc., alleging violations of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§(e) et seq. ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951, et seq. ("PHRA").  The complaint alleges a compound hostile work environment constructive discharge claim, i.e., Strauser asserts that the hostile work environment caused her to resign from her position with defendant.  Plaintiff, formerly employed as a secretary and dispatcher of defendant, asserts that while employed with defendant she was subjected to sexual discrimination, sexual harassment, and a

1

sexually hostile work environment as a result of the conduct of Gerald Fulkroad Sr., ("Fulkroad"), fifty-percent owner and President of defendant.

On April 4, 2005, defendant filed a motion for summary judgment which is now ripe for decision.  For the following reasons we will deny defendant's motion for summary judgment.

## DISCUSSION:

### I.  Standard of Review

It is appropriate for a court to grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"If the nonmoving party has the burden of persuasion at trial, 'the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.'" Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir. 1987)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment the court will draw all

2

reasonable inferences from the evidence in the record in favor of the nonmoving

party.  <u>Am. Flint Glass Workers Union v. Beaumont Glass Co.</u>, 62 F.3d 574, (3d

Cir. 1995).  The nonmoving party, however, cannot defeat a motion for summary

judgment by merely offering general denials, vague allegations, or conclusory

statements; rather the party must point to specific evidence in the record that

demonstrates that there is a genuine issue as to a material fact.  <u>See</u> <u>Celotex</u>, 477

U.S. at 32; <u>Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.</u>, 172 F.3d 238, 252 (3d

Cir. 1999).

## II.  Factual Background

Jay Fulkroad and Sons, Inc., defendant, is a Pennsylvania corporation

located in McAlisterville, Pennsylvania.  Plaintiff worked as a dispatcher and

secretary for defendant from August 1997 until February 2001.  After being

approached to return to her job, plaintiff returned to a part-time dispatcher position

on May 22, 2001.  Plaintiff resigned from her position with defendant on or about

September 18, 2001.

At that time, Strauser stated she was resigning "[b]ecause of Mother [sic]

health taking a turn for the worse as of 9/19/01 I will no longer be working here.

Please send my check to my home address for I will be out of state for an unlimited

amount of time." (Rec. Doc. No. 36, Ex. B, Att. 9/18/01 Memo to Payroll.)  When

plaintiff filled out her notice of Employee Seperation/Rehire form she checked the box that indicated her separation from the company was because of "personal reasons." (Rec. Doc. No. 36, Ex. D, Att.)  Strauser's exit interview was conducted by her alleged harasser's wife.  Although Strauser provided those reasons at the time of leaving employment, Strauser now states the true reason she left her job was because of the sexual harassment by Fulkroad, and the emotional distress and humiliation it caused her.  (Rec. Doc. No. 42, Ex. C, at 6, ¶ 24.)

The defendant corporation is a small family business.  Fulkroad is the President and fifty-percent owner of Jay Fulkroad & Sons, Inc.  James Fulkroad is Fulkroad's brother also owns fifty percent of the defendant corporation.  Karen Fulkroad is Fulkroad's wife, and is also employed by the company.  Karen Fulkroad has been in charge of personnel administration with the company since 1992.  This position makes her responsible for posting required EEOC/PHRC notices, supervising the enrolling of new employees, setting up drug tests, and conducting exit interviews.  Larry Kauffman was defendant's personnel resource coordinator; he hired people, and supervised plaintiff.  Kauffman's daughter was married to James Fulkroad's son.  Kauffman was Strauser's immediate supervisor.  Betty Wirt has been the defendant's EEO Officer since February 16, 2001.

A separate criminal prosecution against Fulkroad has already occurred

4

related to the underlying facts of the instant case.  On or about October 10, 2001,

Strauser reported Fulkroad to the Pennsylvania State Police.  A jury trial was held

where extensive testimony was offered.  (Rec. Doc. No. 36, Criminal Trial

Transcript, Ex. A.)  On February 4, 2003, following the trial in Juniata County,

Fulkroad was found not guilty of criminal indecent assault in relation to the June 21,

2001 incident.

Plaintiff alleges that Fulkroad physically and verbally sexually harassed her

on several dates in 2001.  Plaintiff has provided an affidavit which states in relevant

part:

> On or about June 21, 2001, Gerald Fulkroad, Sr., placed
> his arm around my shoulder while I was making copies in
> the work place.  I pulled away from Fulkroad.  Fulkroad
> then followed me across the room, forcing me to back up
> against a sink.  I tried to push Fulkroad away; however,
> Fulkroad began squeezing my breast and telling [me] how
> firm and nice my breasts were, and that I was a sexy
> woman.  I continued to try to push Fulkroad away.
> Fulkroad then pulled up my top and bra, placed his
> mouth on my left breast and began sucking, and fondled
> my genitalia.  I told Fulkroad to stop.  Finally, I managed
> to escape and left the workplace.  Fulkroad yelled to me
> that I should not tell anyone, not even my husband.

(Rec. Doc. No. 42, Ex. C, at 3, ¶ 11.)

Following the June 21, 2001 incident, Strauser did not go to the hospital for any

kind of treatment.

Defendant has come forward with conflicting testimony and contends that the incident never occurred. At the criminal trial, Isaac Gearhart testified that he was working after 5:00 p.m., on June 21, 2001, in an office Strauser said she entered, and which was right across the hall from where she said Fulkroad assaulted her. Gearhart was positive that he did not see anyone after 5:00 p.m. that evening. Gearhart's time card was punched out at 6:17 p.m., but he states he worked until around 7:00 p.m. and that he did not see Strauser or Fulkroad.

Wade Cleck, a business associate of Fulkroad, also testified at the criminal trial that on the night of June 21, 2001, Fulkroad had picked him up at 5:00 p.m. to go to a packing house in Loganton, about an hour away. Cleck recalled that Fulkroad had purchased gas in Lewistown, and read from Fulkroad's gas receipt that Fulkroad purchased gas at 10:06 p.m. on June 21, 2001. (Rec. Doc. No. 36, Ex. A, 131-32; Rec. Doc. No. 36, Ex. E.)

Plaintiff states that Fulkroad apologized to her on or about June 30, 2001.

Plaintiff's affidavit also states that:

> On or about August 17, 2001, Fulkroad had seen me by looking through a window. He told me to open the door and let him in. I told him to go away and he should not be at my house. Fulkroad stated that if I would open the door and give him a kiss, he would go away. I told him my husband would be home soon and that Fulkroad should go. Fulkroad replied that he wasn't leaving until

he got a kiss.  Fulkroad finally left.

(Rec. Doc. No. 42, Ex. C, at 4, ¶ 16.)

Plaintiff's affidavit then indicates that "[o]n or about August 23, 2001, Fulkroad had called over to my office and told me he was leaving and that I looked real sexy today."  (Rec. Doc. No. 42, Ex. C, at 4, ¶ 17.)  Then, according to plaintiff's affidavit, "[o]n or about September 13, 2001, Fulkroad leaned over my desk in the workplace, grabbed my right breast, and said my breasts were nice.  I told him to stop, and he tried to kiss me.  I evaded the kiss and, as Fulkroad left the room, he told me to stop acting like a little girl, and that I knew that I liked it." (Rec. Doc. No. 42, Ex. C, at 4-5, ¶ 18.)[1]  Strauser remained on the job following this incident for approximately another week, in part because she had promised to attend and participate in the company picnic.  She resigned on or about September 18, 2001.

Plaintiff asserts that Fulkroad continued to harass and intimidate her after she resigned from her position.  This evidence obviously cannot be considered in whether there was a hostile work environment that caused plaintiff to resign her employment, since it occurred after she left her employ with defendant.  However,

---

[1]At the criminal trial Strauser testified that this incident occurred on August 23, 2001, but also that she could not remember the exact day.  (Rec. Doc. No. 36, Ex. A, at 37.)

7

evidence and testimony related to these contacts is relevant to establishing the

veracity of plaintiff's prior allegations of misconduct, to the extent these later

incidents relate to Fulkroad's conduct toward plaintiff before she quit.[2]

While employed with defendant, plaintiff told only Kauffman, her immediate

supervisor, about the incidents that occurred between June and September 2001.[3]

She told him not to do anything because "I didn't want him to get in the middle of

it.  I didn't want his job jeopardized."  (Rec. Doc. No. 36, Ex. A, at 33, 66.)

---

[2]The first such post-employment contact occurred on or about September 29, 2001.  Strauser affirms that "Fulkroad came to my house and was looking in my windows, so I hid in the basement.  Fulkroad knocked and tried to open doors, including the basement door, and also called out my name to open the door.  He left after approximately ten minutes."  (Rec. Doc. No. 42, at 5, ¶ 19.)  The next incident occurred on or about October 8, 2001, when Fulkroad again came to her home and looked through the window.  Upon seeing the plaintiff, Fulkroad allegedly banged hard on the window, requested that plaintiff open the door and stated that he just wanted to talk for a minute.  (Rec. Doc. No. 42, at 5, ¶ 20.)  Defendant asserts that Mrs. Fulkroad asked Fulkroad to stop at Strauser's house after seeing her van at her house because she believed Strauser would be staying out of town with her sick mother.

[3]Plaintiff asserts that on or about June 21, 2001, plaintiff called Kauffman at home, but was silent.  When Kauffman asked what was wrong, plaintiff said she would talk to him next week.  She did not tell him what happened.  Then on or about June 26, 2001, plaintiff was very quiet and subdued so Kauffman again asked her what was wrong.  After some initial hesitation, plaintiff became hysterical and cried.  She then told Kauffman what happened, but asked him not to tell anyone because she was afraid.  At the criminal trial the court did not allow her exact statements into the record because they were hearsay, but the evidence, taken in a light most favorable to the plaintiff, indicates that Kauffman received notice from Strauser about the harassment.

Defendant admits that Kauffman was fully aware of how to report alleged incidents of harassment.  Strauser testified at Fulkroad's criminal trial that she didn't want people in the office, other than Kauffman, to know about the harassment because she was afraid of Fulkroad, and she did not want Mrs. Fulkroad to know.  Mrs. Fulkroad also worked in the office.  Plaintiff testified at the criminal trial that she did not feel that "somebody would do something." (Rec. Doc. No. 36, Ex. A, at 40.) At the criminal trial Kauffman testified that Strauser contacted him again on September 29, 2001, after she had already left her employ, and was hysterical. Kauffman told plaintiff to call her husband.  (Rec. Doc. 36, Ex. A, at 101.)

Kauffman testified at the criminal trial that he guessed he was aware of defendant's policy against sexual harassment, was aware that Wirt was the EEO Officer, and that he had been the EEO Officer in the past.  He did not remember being at a February 2001 superintendent meeting where Wirt discussed the importance of the sexual harassment policy, but must have attended the meeting. Kauffman stated if he had taken Strauser's sexual harassment complaint to Wirt he envisioned her bringing it to Fulkroad, but also, he admitted that he previously testified that the thought of bringing a complaint to Wirt never crossed his mind. Kauffman testified that the EEO officer would take the report to Fulkroad and his wife, and that it "basically all came to Gerald Fulkroad's lap.  He had the final say

on the check writing and whatever took place." (Rec. Doc. No. 36, Ex. A, at 119.)

At the criminal trial, Strauser testified that she did not know Wirt was defendant's EEO Officer, but that regardless, she would not have gone to her with her complaint. Strauser testified at the criminal trial and stated in her affidavit that following any reporting procedure would have been a "fruitless gesture." (Rec. Doc. No. 36, Ex. A, at 73; see also Rec. Doc. No. 42, at 5, ¶ 22.) Strauser felt this way because the harasser was the president of the company, his wife was one of the persons through whom any report would pass, and the business was a very closely run family operation.

Betty Wirt was appointed as defendant's EEO Officer. Wirt never received any complaints in 2001 from plaintiff regarding Fulkroad. Nor did she observe anything that indicated plaintiff was afraid of Fulkroad. Defendant asserts that plaintiff received the defendant's employee handbook and the company's sexual harassment policy. Plaintiff disagrees and states that she received the handbook, but that she never received or was informed of the reporting procedure of the anti-harassment program. Defendant states that the anti-harassment policy was posted in the office. In response plaintiff states that she never observed the posted sexual harassment policy.

Strauser states that she told Alvin Strauser, her husband, about the

harassment for the first time on October 8, 2001.  At the criminal trial plaintiff's

husband testified that after plaintiff told him about Fulkroad's conduct he called

Fulkroad and asked him if he had been in the Strauser driveway and Fulkroad

admitted that he had been.  Mr. Strauser then asked Fulkroad if he had touched

plaintiff's breast, and Fulkroad admitted that he had and chuckled.  (Rec. Doc. No.

43, Ex. A, at 82-85.)

Two days after telling her husband, Strauser reported Fulkroad to the

Pennsylvania State Police.  When Strauser reported the incident to the State Police

she stated that the indecent assault occurred on a Wednesday either the last week

of August, or the first week of September 2001.  After talking to Kauffman,

Strauser changed the date to June 21, 2001.

Plaintiff has offered an excerpt from the criminal trial, where Kauffman

testified about a conversation he had with Fulkroad in mid-October 2001 after

Fulkroad called him to his office.  The conversation came about because Fulkroad

had discovered that Strauser had applied for unemployment based on sexual

harassment and the police wanted to talk to him.  Fulkroad told Kauffman that he

had to figure out "whether to admit to [sexual harassment] or deny it."  (Rec. Doc.

No. 42, Ex. D, at 102)[4]  According to Kauffman, on that day, Fulkroad told him he

had "played with her tits a couple of times."  (Rec. Doc. No. 42, Ex. D, at 102.)

### III.  Strauser's Title VII and PHRA Claims

At the outset, we note that PHRA claims are interpreted coextensively with

Title VII claims. Douris v. Genaurdi's Family Markets, Inc., 132 Fed. Appx. 425,

425 n.1 (3d Cir. 2005) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.

1996)); Dennison v. Pennsylvania Dept. Of Corrections, 268 F. Supp. 2d. 387, 405

n.16 (M.D. Pa. 2003.) (Munley, J.).  Therefore, our analysis under Title VII applies

with equal force to Strauser's claims under the PHRA.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The United

States Supreme Court in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986),

described how a plaintiff could bring either a "quid pro quo" claim or a "hostile

work environment" claim.  The Supreme Court in Burlington Industries, Inc. v.

Ellerth, 524 U.S. 742 (1998), indicated that the significance of these labels is only to

---

[4]Defendant had omitted this page when it submitted the transcript from the
criminal trial as an exhibit.

sort out the various ways sexual harassment can occur.[5]

The issue in this case is a common one to Title VII litigation: is plaintiff's employer liable for the harassment of plaintiff committed by another person in its employ? Because Fulkroad, plaintiff's alleged harasser, was the president of the defendant, and 50% owner of the corporation, the case also presents the less litigated issue of alter-ego liability.

Strauser relies upon a hostile work environment theory under Title VII to make her case. In order to bring an action successfully under Title VII for a hostile work environment, a Third Circuit plaintiff must prove a prima facie case that: (1) she suffered intentional discrimination because of her gender; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the

---

[5]The court framed its discussion by noting:

> Cases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. The terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility.

Ellerth, 524 U.S. at 751.

13

discrimination would detrimentally affect a reasonable person of the same sex in that position; (5) the existence of respondeat superior liability. See Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001) (quoting Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)).  Since Strauser's claim is a compound hostile work environment constructive discharge claim, she must also prove that the "working conditions were so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, ___, 124 S.Ct. 2342, 2354 (2004).

Defendant's motion for summary judgment is confined to two issues.  First, defendant maintains that plaintiff has produced insufficient evidence to establish the fifth element of a hostile work environment, i.e., the existence of respondeat superior liability.[6]  Second, defendant asserts that plaintiff has failed to present evidence required to establish the second element of a constructive discharge claim, i.e., that the discrimination alleged was pervasive and regular.  We now address

_____

[6]In its brief in support of summary judgment, defendant while addressing the issue of respondeat superior liability, also argues that Strauser's working conditions were not so intolerable that a reasonable person would have felt compelled to resign.  (See Rec. Doc. No. 37, at 12, ¶¶ 1-2.) We briefly address that issue at the conclusion of the next subsection.

only those issues raised by defendant.

### A.  Respondeat Superior Liability and Affirmative Defenses

The first issue applicable to defendant's instant motion is whether the plaintiff has presented sufficient evidence as to the fifth element, i.e. respondeat superior liability, so as to be able to go to trial and establish defendant's liability. Respondeat superior liability is guided by agency principles.  Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir. 1990) (citing Vinson, 477 U.S. at 72). Liability exists where the employer knew or should have known of the harassment and failed to take prompt remedial action.  Kunin, 175 F.3d at 293-94 (quoting Andrews, 895 F.2d at 1486).  Defendant's summary judgment motion requires us to examine the availability of the Supreme Court's Ellerth/Faragher affirmative defenses.

The United States Supreme Court in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), established a framework for an employer's defenses to claims of sexual harassment under Title VII.  In order for a Title VII defendant to negate liability where there was no tangible employment action, defendant must establish by the preponderance of the evidence that: (1) defendant exercised reasonable care to prevent and correct

promptly any sexually harassing behavior, and (2) plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  Faragher, 524 U.S. at 807-08; Burlington, 524 U.S. at 765; Hurley v. Atlantic City Police Dept., 174 F.3d 95, 118 (3d Cir. 1999).

In the instant case defendant asserts that Strauser failed to avail herself of the company's anti-harassment policy and that therefore defendant should be entitled to summary judgment.  Both parties have extensively briefed the issue of defendant's anti-harassment policy, whether plaintiff received and reviewed the policy, and whether the reporting mechanism as set forth in the policy was adequate.  In passing we note that defendant's Employee Handbook does not contain a sexual harassment policy.[7]  The one-page sexual harassment policy is a separate unnumbered document in the record.  We note that the pro forma policy indicates that Betty Wirt is the EEO officer and her address is provided as a contact.  There is a genuine issue of material fact as to whether Strauser actually received the policy.  (See Rec. Doc. No. 42, Ex. C, at 2, ¶ 2; see also Rec. Doc. No. 36, Ex. B (attached exhibits contain Strauser's signature acknowledging receipt

---

[7] However, the thirty-six page employee handbook is very thorough and contains a deer-hunting season leave policy.  (Rec. Doc. No. 42, Ex. A, at 14.)

16

of employee handbook and not anti-harassment policy in 1997 and 2001); <u>cf.</u> Rec.
Doc. No. 36, Ex. B, at 2, ¶ 7 (Wirt's affidavit asserting Strauser received anti-
harassment policy).)

Furthermore, we find that, even if the <u>Faragher/Ellerth</u> affirmative defense
were to apply to the facts of this case,[8] there is a genuine issue of material fact as to
the effectiveness of defendant's anti-harassment policy.  Defendant admits that
plaintiff provided actual notice to Kauffman regarding the alleged incidents, but that
Kauffman did not report the incidents.  Additionally, the revised rules section of the
employee handbook, which discusses the company's equal employment
opportunity (EEO) program and states that it is the policy of defendant to treat
employees without regard to their sex, indicates that Fulkroad personally oversaw
the EEO program and appointed the EEO Officer.  (Rec. Doc. No. 42, Ex. A, at
25, ¶¶ 1, 2.)

According to the handbook the EEO officer "should oversee all employment
practices and develop remedies to all discriminatory employment practices."  (Rec.

---

[8]As more extensively set forth in the following paragraphs, it appears the
facts of this case, where the alleged harasser is the president and co-owner of the
employer, fall squarely within the alter-ego theory for establishing employer liability
under Title VII, thereby eradicating the need for any anti-harassment policy
analysis.

Doc. No. 42, Ex. A, at 26, ¶ 2(a).)  The revised section includes a commitment to "maintain a working environment free of harassment, intimidation, and coercion at all sites and in all facilities at which the Company's employees are assigned to work." (Rec. Doc. No. 42, Ex. A, at 26, ¶ 3.  The handbook states that the EEO Officer will "[r]eport at least quarterly to the President of Jay Fulkroad & Sons, Inc. on the progress of the company's entire program." (Rec. Doc. No. 42, Ex. A, at 26, ¶ 2(c).)

Where the president of defendant is the alleged harasser and the performance of the defendant's entire EEO program, according to the employee handbook, is to be reported to that same president; where the president, and alleged harasser, "had the final say on the check writing and whatever took place";[9]  where plaintiff provided Kaufmann, her supervisor, actual notice of the alleged harassment, and he failed to report the conduct to the defendant's EEO Officer; and where the employer was a very closely run family business, a business that had a reporting mechanism that would involve the report being presented to the alleged harasser's

---

[9](Rec. Doc. No. 36, Ex. A, at 119.)

wife,[10] and then on to the alleged harasser, "Gerald Fulkroad's lap";[11] we find that there is a genuine issue of material fact as to the effectiveness of the defendant's anti-harassment policy.

We now address the alter-ego theory of employer liability under Title VII. Plaintiff in her brief opposing summary judgment notes that there is "no doubt that the requisite agency relationship and knowledge by the employer is established." (Rec. Doc. No. 11, at 11.)  As we have already noted, agency principles govern respondeat superior liability under Title VII.  In <u>Ellerth</u> the United States Supreme Court briefly discussed Section 219(2) of the Restatement of Agency and its applicability to supervisor harassment under Title VII.  The Court noted that subsection (a) of the Restatement "addresses direct liability, where the employer acts with tortious intent, <u>and indirect liability, where the agent's high rank in the</u> <u>company makes him or her the employer's alter ego</u>."  <u>Burlington</u>, 524 U.S. at 758 (emphasis added).  The alter-ego theory is relevant to the case at hand because it would prevent defendant from relying on the <u>Ellerth/Faragher</u> affirmative defense.

In <u>Faragher</u>, the companion case to <u>Ellerth</u>, the Supreme Court listed with

---

[10](Rec. Doc. No. 36, Ex. A, at 162.)  Karen Fulkroad also conducted plaintiff's September 2001 exit interview.  (Rec. Doc. No. 36, Ex. C, at 3, ¶ 12.)

[11](Rec. Doc. No. 36, Ex. A, at 119.)

approval a series of cases that employed the alter ego theory of liability.  Faragher,

524 U.S. at 789.[12]  Under the alter-ego theory certain high ranking officials'

conduct can be held automatically imputable to the employer.  Nevertheless, there

is very little case law on the alter-ego theory of liability.  See Mallinson-Montague v.

Pocrnick, 224 F.3d 1224, 1232 (10th Cir. 2000) (recognizing theory and noting an

"absolute scarcity of case law development of this alternative avenue of employer

---

[12]In relevant part the Supreme Court stated:

> Nor was it exceptional that standards for binding the
> employer were not in issue in [Harris v. Forklift Systems,
> Inc., 510 U.S. 17 (1993)].  In that case of discrimination
> by hostile environment, the individual charged with
> creating the abusive atmosphere was the president of the
> corporate employer, 510 U.S., at 19, 114 S.Ct., at 369,
> who was indisputably within that class of an employer
> organization's officials who may be treated as the
> organization's proxy. Burns v. McGregor Electronic
> Industries, Inc., 955 F.2d 559, 564 (8th Cir. 1992)
> (employer-company liable where harassment was
> perpetrated by its owner); see Torres v. Pisano, 116 F.3d
> 625, 634-635, and n. 11 (2d Cir.) (noting that a supervisor
> may hold a sufficiently high position "in the management
> hierarchy of the company for his actions to be imputed
> automatically to the employer"), cert. denied, 522 U.S.
> 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); cf. Katz,
> supra, at 255 ("Except in situations where a proprietor,
> partner or corporate officer participates personally in the
> harassing behavior," an employee must "demonstrat[e]
> the propriety of holding the employer liable").

liability");[13] <u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 152 n.8 (3d Cir. 1999) (recognizing existence of alter-ego theory of liability).

The Seventh Circuit has stated that "<u>Faragher</u> suggests that the following officials may be treated as an employer's proxy: a president, owner, proprietor, partner, corporate officer, or supervisor 'hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" <u>Johnson v. West</u>, 218 F.3d 725, 730 (7th Cir. 2000) (quoting <u>Faragher</u>, 524 U.S. at 789-90). Fulkroad, as fifty-percent owner and president of defendant employer, falls squarely within the class of persons whose conduct could be automatically imputed to the employer according to the United States Supreme Court.

We now briefly turn to a separate argument advanced by defendant under the first portion of its brief. Defendant asserts that plaintiff could have remained on the job while seeking redress." <u>Suders</u>, 124 S.Ct. 2354. Essentially, defendant contends that the conditions of the job were not so unbearable to warrant Strauser's decision to leave the job. Defendant asserts that evidence of plaintiff's

---

[13]The Tenth Circuit, because the issue was not raised on appeal, did not determine "whether the question of whether a high-ranking manager is his or her employer's alter ego is a question of fact for the jury or a question of law for the court." <u>Mallinson-Montague</u>, 224 F.3d at 1232 n.7.

decision to remain at work and attend the company picnic would prevent any reasonable jury from finding that her working conditions were so oppressive that resignation was the only fitting response.  We disagree, and find that assuming as true plaintiff's allegations that she was physically and verbally sexually accosted on several occasions by the president and fifty-percent owner of her company, a reasonable jury could find that the harassment she suffered was of a degree that a reasonable person would be forced to quit.

B.  Plaintiff Made Prima Facie Case that Discrimination was Pervasive & Regular

As noted above, the second element of a sexual harassment claim based on a hostile work environment is that the discrimination alleged was pervasive and regular.  Kunin, 175 F.3d at 293; see also Abramson, 260 F.3d at 276 n.6 (discussing and comparing Third Circuit language of pervasive and regular with Supreme Court language of severe or pervasive, and noting that Third Circuit on at least one previous occasion employed the severe or pervasive language).  Defendant contends that "a reasonable jury could reach no finding other than a determination that Ms. Strauser was not assaulted on June 21, 2001."  (Rec. Doc. No. 37, at 14.)  Defendant then contends that plaintiff's other allegations only involve an incident of touching and two remarks.  Essentially, defendant asserts that

the evidence in the record is insufficient to proceed to trial for plaintiff to prove that the harassment, if it did occur, altered the terms and conditions of her employment.

The Supreme Court has outlined the substantive contours of behavior that constitutes a hostile work environment, and has directed the lower courts to "look[] at all the circumstances" in determining whether an environment is sufficiently hostile or abusive.  Faragher, 524 U.S. at 787 (quoting Harris, 510 U.S. at 23). This multi-factor analysis includes the courts' looking at the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher, 524 U.S. at 788 (quoting Harris, 510 U.S. at 23).  The Supreme Court then noted that, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Faragher, 524 U.S. at 788 (citations and internal quotation marks omitted).  In order for a claim to be actionable, "[t]he plaintiff must subjectively perceive the environment to be hostile or abusive, and conditions must be such that a reasonable person would have the same perception."  Konstantopoulos v. Westvaco Corp., 112 F.3d 710 (3d Cir. 1997) (citing Harris, 510 U.S. at 21.)

Defendant's attempt to minimize plaintiff's allegations are not persuasive. Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether she was working in a hostile work environment, and more specifically whether Strauser was sexually assaulted on June 21, 2001 by Gerald Fulkroad Sr., the president and co-owner of her employer.  The conflicting evidence regarding the events of June 21, 2001 should be heard by a jury; a jury can then make credibility determinations at trial as to each of witness's testimony.  Furthermore, the court is not impressed by defendant's attempt to minimize the alleged conduct of Fulkroad on September 13, 2001 where he grabbed plaintiff's breast and attempted to kiss her while calling her a "little girl," by characterizing his actions as a "touching event."  (Rec. Doc. No. 37, at 15.)

**CONCLUSION:**

For all the foregoing reasons the defendant's motion for summary judgment on the complaint will be denied.

   s/ James F. McClure, Jr.

James F. McClure, Jr.

United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WANDA STRAUSER,            :

                                   :    Case No. 4:03-CV-2017

          Plaintiff           :

                                   :

          v.                  :    (Judge McClure)

                                   :

JAY FULKROAD                :

AND SONS, INC.,         :

                                   :

          Defendant      :

**O R D E R**

July 28, 2005

For the reasons set forth in the accompanying memorandum,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    Defendant's motion for summary judgment is denied.  (Rec. Doc. No. 27.)

2.    The case is placed on the court's October, 2005 trial list.

3.    Jury selection will take place on October 12, 2005 at 10:00 a.m.  in

1

Courtroom No. 1, Fourth Floor, Federal Building, 240 West Third

Street, Williamsport, Pennsylvania.

4.      A final pretrial conference will be held on August 31, 2005 at 2:30 p.m.

in chambers, Third Floor, Federal Building, 240 West Third Street,

Williamsport, Pennsylvania.

5.      Motions in limine shall be filed on or before August 19, 2005,

accompanied by supporting briefs.  Opposing briefs shall be filed no

later than August 31, 2005.  No reply briefs shall be permitted.


   s/ James F. McClure, Jr.

James F. McClure, Jr.

United States District Judge


2